**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

INDIAN HARBOR INSURANCE COMPANY,

Plaintiff,

-against-

METROPOLITAN NASHVILLE AIRPORT
AUTHORITY,

Defendant.

Case No. _____

**COMPLAINT FOR**
**<u>DECLARATORY RELIEF</u>**

Plaintiff, Indian Harbor Insurance Company ("Indian Harbor"), by its undersigned

counsel, files this complaint for declaratory relief against Defendant, Metropolitan Nashville

Airport Authority ("Airport Authority"), and states:

<b>PARTIES, JURISDICTION, AND VENUE</b>

1.      Indian Harbor is a Delaware corporation with its principal place of business in

Stamford, Connecticut. It is a citizen of Delaware and Connecticut.

2.      The Airport Authority is a Tennessee municipal corporation created pursuant to

Tenn. Code § 42-4-104, and has its principal place of business in Nashville, Tennessee, where it

operates Nashville International Airport (airport code BNA). The Airport Authority is a citizen

of Tennessee.

3.      The amount in controversy is $5,000,000, exclusive of interest and costs.

4.      The Court has jurisdiction under 28 U.S.C. § 1332 over this lawsuit between

citizens of different states, with an amount in controversy in excess of $75,000, exclusive of

interest and costs.

5.      The parties' controversy arises under an insurance contract between Indian

Harbor and the Airport Authority—Project Specific: Contractor's Pollution Legal Liability

policy, policy number CPL7446068 ("Indian Harbor Policy"), effective from March 1, 2017 to March 1, 2020—which includes the following provisions:

> **Choice of Law --** All matters arising hereunder including questions or disputes related to the validity, interpretation, performance and enforcement of this Policy will be determined in accordance with the law and practice of the State of New York (notwithstanding New York's conflicts of law rules) ….

> **Jurisdiction and Venue --** It is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company and the INSURED will submit to the jurisdiction of the State of New York and will comply with all the requirements necessary to give such court jurisdiction. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's right to remove an action to a United States District Court.

## FACTS

### The Indian Harbor Policy

6.     The Airport Authority seeks coverage under the Indian Harbor Policy with respect to a lawsuit filed by Colonial Pipeline Company ("Colonial") against the Airport Authority in the United States District Court Middle District of Tennessee, Case Number 4:19-cv-1763 ("the Underlying Lawsuit").

7.     The Indian Harbor Policy has limits of liability of $5,000,000 "Each Claim" and $5,000,000 in the aggregate, subject to a $25,000 self-insured retention.

8.     The Airport Authority seeks coverage under the Indian Harbor Policy's "Coverage A – JOB SITE – Occurrence," the insuring agreement of which provides:

> The Company will pay on behalf of the INSURED for POLLUTION LOSS which the INSURED becomes legally obligated to pay as a result of a POLLUTION CONDITION at a JOB SITE, provided that:

> 1. BODILY INJURY, PROPERTY DAMAGE or ENVIRONMENTAL DAMAGE occurs during the POLICY PERIOD or COMPLETED OPERATIONS PERIOD;

> 2. the POLLUTION CONDITION results from CONTRACTING SERVICES rendered prior to the expiration of the POLICY PERIOD;

3. the POLLUTION CONDITION is on, at, under or migrating from a JOB SITE; and

4. the POLLUTION CONDITION results in a CLAIM against the INSURED.

9.      The Indian Harbor Policy defines "CONTRACTING SERVICES" as "those activities listed in Item (5) of the Declarations that are rendered by or on behalf of the [Airport Authority]."

10.     Item (5) of the Declarations states: "All construction activities for the Metropolitan Nashville Airport Authority's Capital Improvement Projects."

11.     The Indian Harbor Policy (Endorsement # 3) defines "JOB SITE," in relevant part, as "the location where CONTRACTING SERVICES are being rendered.  JOB SITE also includes a location that is used by the INSURED on a temporary basis for the project described in Item (5) of the Declarations, during the course of providing CONTRACTING SERVICES for such project."

12.     "CLAIM" is defined in relevant part as a "monetary demand or notice, or assertion of a legal right alleging liability or responsibility on the part of any INSURED and includes a lawsuit, petition, or governmental or regulatory action commenced against any INSURED."

13.     "POLLUTION CONDITION" is defined in relevant part as "the discharge, dispersal, release, seepage, migration or escape of POLLUTANTS into or upon land, or structures thereupon, the atmosphere or any watercourse or body of water, including groundwater."

14.     "SECTION VII. Reporting, Defense, Settlement and Cooperation," paragraph A, requires, as a condition precedent to coverage, that the Airport Authority notify Indian Harbor of each of the following as soon as practicable: "a. a CLAIM; b. BODILY INJURY or PROPERTY

DAMAGE which may result in a CLAIM; c. a POLLUTION CONDITION; and d. a REMEDIATION EXPENSE."

15.     The Indian Harbor Policy was not issued or delivered in the State of New York.

16.     Indian Harbor issued the Indian Harbor Policy in Pennsylvania.

17.     Indian Harbor delivered the Indian Harbor Policy in Tennessee.

18.     The Airport Authority purchased separate coverage for pollution that did not result from contracting services from Greenwich Insurance Company ("Greenwich").

19.     Specifically, Greenwich issued to the Airport Authority a Pollution and Remediation Legal Liability policy, number PEC0049423 for the period March 1, 2017 to March 1, 2020 ("Greenwich Policy").

20.     The Greenwich Policy provides: "The Company will pay on behalf of the INSURED for LOSS and related LEGAL EXPENSE resulting from any POLLUTION CONDITION on, at, under or migrating from any COVERED LOCATION, which the INSURED has or will become legally obligated to pay as a result of a CLAIM first made against the INSURED during the POLICY PERIOD and reported to the Company, in writing, by the INSURED, during the POLICY PERIOD or, where applicable, the EXTENDED REPORTING PERIOD."

21.     The Airport Authority did not purchase an Optional Extended Reporting period at the expiration of the Greenwich Policy.

22.     The Greenwich Policy included limits of $5,000,000 each Pollution Condition and $5,000,000 in the aggregate, subject to a self-insured retention of $1,000,000 each Pollution Condition.

**The TDOT Project and the Line Strike**

23.     The Airport Authority's Capital Improvement Projects involved the design and construction of a new Terminal Drive inner roadway system.

24.     On April 9, 2019, the Tennessee Department of Transportation ("TDOT") struck Colonial's gasoline pipeline ("Line Strike") while performing soil boring operations on the Airport Authority's property.

25.     The soil-boring operations were not for the Airport Authority's Capital Improvement Projects.

26.     Rather, the soil-boring operations were for TDOT's I-40 / Donelson Pike (SR 255) Interchange Project ("TDOT Project").

27.     The TDOT Project was separate from the Airport Authority's project to improve internal airport roadways.

28.     At a public meeting on October 23, 2018, TDOT's project engineer explained the purpose of the TDOT Project:

> So the purpose and need is really driven by the rapid growth of downtown Nashville, the surrounding cities in Middle Tennessee, but then also the growth that the Nashville airport has been experiencing over the years. And the purpose of the job is to improve the safety and the overall operations of the I-40 Donelson Pike interchange. So behind me is a visual of how you access the airport today using Donelson Pike. So there's a significant amount of traffic traveling north and south on Donelson Pike, but there's also a significant amount of traffic getting to and from the airport. And so on the north, whenever we have that traffic merging up at the interchange, there's a significant amount of congestion at the interchange. And the airport is witnessing cut-through traffic into their circulation road, which is causing a jam up on their end. And so we have airport traffic mixing with TDOT and causing congestion and TDOT traffic jamming up the airport circulation road. So the issue has been identified. So one thing – this project has been advertised in the past as part of the BNA vision. I know it's been several different presentations. But just for clarification, there are two different projects going on, two different parties.

29.     The Airport Authority's chief engineer spoke after TDOT's engineer and stated: "The Metropolitan Nashville Airport Authority fully supports TDOT's project to realign Donelson Pike and provide a new interchange with Interstate 40."

30.     On November 14, 2018, TDOT and the Airport Authority entered into a Memorandum of Understanding ("MOU").

31.     Under the MOU, the Airport Authority granted TDOT property rights in connection with the TDOT Project.

32.     In the MOU, TDOT and the Airport Authority acknowledged that their projects would proceed concurrently, allowing for adequate access at all times to the airport, but they agreed that each party was responsible for its own negligent acts or omissions.

**The Airport Authority's 16-Month Delay in Notifying Indian Harbor**

33.     The Line Strike caused an approximately 14,000 gallon gasoline spill on the Airport Authority's land and into McCrory Creek.

34.     The Airport Authority was aware of the Line Strike and resulting gasoline discharge in April 2019.

35.     The Airport Authority incurred approximately $400,000 in immediate cleanup costs.

36.     The gasoline spill from the Line Strike constitutes a "POLLUTION CONDITION" under the Indian Harbor Policy.

37.     Because the Airport Authority is asserting it is entitled to coverage under the Indian Harbor Policy, it had a duty to notify Indian Harbor of the "POLLUTION CONDITION" resulting from the Line Strike as soon as practicable.

38.     The Airport Authority did not notify Indian Harbor of the "POLLUTION CONDITION" until August 26, 2020.

39.     On April 6, 2020, one year after the Line Strike and resulting POLLUTION CONDITION, the Airport Authority and Colonial executed a Tolling Agreement.

40.     The Tolling Agreement reflects that Colonial had already asserted a "CLAIM," as defined in the Indian Harbor Policy.

41.     Specifically, the Tolling Agreement states that "one or both Parties have incurred and/or likely will incur costs and damages arising out of or relating to the Line Strike," and that the "Parties are interested in resolving by agreement potential claims between them and possibly others arising out of or relating to the Line Strike."

42.     The Tolling Agreement also reflects that the Airport Authority had already engaged the law firm of Waller Lansden Dortch & Davis, LLP ("Waller"), including with respect to the defense of Colonial's "CLAIM."

43.     Specifically, the Tolling Agreement requires that Colonial copy Waller on any notices given under the agreement's terms.

44.     The Airport Authority did not give Indian Harbor notice of Colonial's "CLAIM" when it was made or as soon as practicable thereafter.

45.     Colonial filed the Underlying Lawsuit on July 31, 2020.

46.     The Airport Authority, through Waller, executed a waiver of service of process on August 11, 2020.

**The Airport Authority's August 2020 Notice**

47.     The Airport Authority first reported the Underlying Lawsuit to Indian Harbor and Greenwich on August 26, 2020.

48.     On August 28, 2020, Indian Harbor requested that the Airport Authority provide information so Indian Harbor could complete its initial investigation and evaluate coverage. Indian Harbor reserved its rights, including the right to decline coverage based on late notice.

49.     The Airport Authority did not provide the requested information until February of 2021.

50.     On February 16, 2021, Indian Harbor declined coverage for the Underlying Lawsuit on the ground that the POLLUTION CONDITION did not result from the CONTRACTING SERVICES, as required by the Indian Harbor Policy, and on the ground that the Airport Authority did not comply with the policy's notice provisions.

51.     The Airport Authority asked Indian Harbor to reconsider its declination on the ground that it was unclear whether the Underlying Complaint asserted a claim resulting from the CONTRACTING SERVICES.  The Airport Authority further argued that Indian Harbor did not have a late notice defense because it had not suffered any prejudice, as allegedly required under New York law.

52.     By letter dated June 16, 2021, Indian Harbor agreed to participate in the defense of the Airport Authority under a complete reservation of rights.

53.     Indian Harbor's reservation of rights includes, but is not limited to:

- the Airport Authority breached of its duty to notify Indian Harbor of the "POLLUTION CONDITION" and/or the "CLAIM" as soon as practicable;

- the "POLLUTION CONDITION" did not result from "CONTRACTING SERVICES";

- Exclusions B ("Contractual Liability"), M ("Known Circumstances or Conditions"), and R ("Professional Liability") may bar coverage in whole or in part; and

- Indian Harbor may seek reimbursement of defense costs in the event it is determined that it has no defense obligation, in whole or in part.

54.     Greenwich denied coverage under the Greenwich Policy for the Underlying Lawsuit on March 12, 2021. It cited the Airport Authority's failure to report the Underlying Lawsuit by March 1, 2020, as required by the Greenwich Policy's claims-made-and-reported insuring agreement.

55.     The Airport Authority has acquiesced in Greenwich's denial of liability.

56.     The Airport Authority contends that N.Y. Ins. Law § 3420 requires Indian Harbor to demonstrate prejudice to disclaim coverage under the Indian Harbor Policy. However, the provisions of N.Y. Ins. Law § 3420(a)(5) and § 3420(c)(2) do not apply to the Indian Harbor Policy because it was not issued or delivered in the State of New York.

57.     Through its argument that N.Y. Ins. Law § 3420(a)(5) and  § 3420(c)(2) apply to the Indian Harbor Policy, and through its contention that the "POLLUTION CONDITION" resulted from "CONTRACTING SERVICES," the Airport Authority seeks to circumvent its failure to timely report the Underlying Lawsuit to Greenwich, and to shift its coverage claim from the Greenwich Policy (under which the Airport Authority has a $1,000,000 self-insured retention) to the Indian Harbor Policy (under which the Airport Authority has a $25,000 self-insured retention).

## COUNT I – DECLARATORY RELIEF (LATE NOTICE)

58.     Indian Harbor incorporates by reference all preceding allegations of this pleading as if fully set forth herein.

59.     The Indian Harbor policy requires, as a condition precedent to coverage, notice as soon as practicable of: "a. a CLAIM; b. BODILY INJURY or PROPERTY DAMAGE which

may result in a CLAIM; c. a POLLUTION CONDITION; and d. a REMEDIATION EXPENSE."

60.     The Line Strike happened on April 9, 2019.

61.     The Airport Authority was aware on April 9, 2019 of the Line Strike and the resulting gasoline spill.

62.     Prior to April 6, 2020, the Airport Authority was aware that Colonial had asserted a CLAIM against the Airport Authority.

63.     The Airport Authority did not provide Indian Harbor notice of the Line Strike, POLLUTION CONDITION, REMEDIATION EXPENSE or CLAIM until August 26, 2020.

64.     The Airport Authority failed to provide notice of the POLLUTION CONDITION as soon as practicable.

65.     The Airport Authority failed to provide notice of a REMEDIATION EXPENSE as soon as practicable.

66.     The Airport Authority failed to provide notice of CLAIM as soon as practicable.

67.     The Airport Authority violated a condition precedent to coverage under the Indian Harbor policy.

68.     Indian Harbor need not demonstrate prejudice as a result of the Airport Authority's late notice, as the Indian Harbor policy was not issued or delivered in the State of New York.

69.     Indian Harbor is entitled to a declaration that it is not obligated to defend or indemnify the Airport Authority with respect to the Underlying Lawsuit, the Line Strike, the POLLUTION CONDITION or the CLAIM.

## COUNT II - DECLARATORY RELIEF AS TO DEFENSE

70.     Indian Harbor incorporates by reference all preceding allegations of this pleading.

71.     The Airport Authority contends that Indian Harbor has a duty to defend it in the Underlying Lawsuit, and to pay all of its defense counsel's invoices in full.

72.     Indian Harbor contends that no duty to defend arose under the Indian Harbor Policy in the first instance, that its defense obligation should be declared terminated as of a date certain, that the Airport Authority has failed to establish the reasonableness of Waller's invoices and rates, and/or that Indian Harbor is entitled to reimbursement of some or all defense costs it has paid under the Indian Harbor Policy.

73.     An actual and justiciable controversy exists between Indian Harbor and the Airport Authority as to these matters.

.

## COUNT III - DECLARATORY RELIEF AS TO INDEMNITY

74.     Indian Harbor incorporates by reference all preceding allegations of this pleading.

75.     The Airport Authority contends that Indian Harbor has a duty to indemnify it as to the Underlying Lawsuit.

76.     Indian Harbor contends that the aforementioned policy provisions bar or limit coverage for any judgment or settlement in the Underlying Lawsuit.

77.     An actual and justiciable controversy exists between Indian Harbor and the Airport Authority as to these matters.

WHEREFORE, Indian Harbor respectfully requests that the Court issue judgment that it has no duty to defend and indemnify the Airport Authority in the Underlying Lawsuit, or with respect to any other CLAIM, POLLUTION CONDITION or REMEDIATION EXPENSE

resulting from the Line Strike, along with such other and further relief as this Court deems just and proper.

Dated:          November 18, 2021

                                    MOUND COTTON WOLLAN & GREENGRASS

                                    By: /s/   Lloyd A Gura_____
                                    Lloyd A. Gura (LAG 0500)
                                    Ellen G. Margolis (EGM 2328)
                                    Attorneys for Indian Harbor Insurance Company
                                    One New York Plaza
                                    New York, NY  10004
                                    212-804-4200
                                    lgura@moundcotton.com
                                    emargolis@moundcotton.com